GRETE HEINEMANN, Plaintiff, *v.* JEWISH AGRICULTURAL SOCIETY, INC., Defendant.

HERBERT HEINEMANN, Plaintiff, *v.* JEWISH AGRICULTURAL SOCIETY, INC., Defendant.

Supreme Court, Chautauqua County, August 12, 1942.

*Joseph Rubenstein* [*Philip Halpern, Milton H. Friedman* and *Emil L. Cohen* of counsel], for the plaintiffs.

*Frank C. Roberts* [*Roy P. Ohlin* and *Charles F. Steele* of counsel], for the defendant.

JAMES, J. These are actions to recover damages for personal injuries alleged to have been sustained by the plaintiff Grete Heinemann in an automobile accident, and for resultant damage to her husband. The actions have been tried together under the following stipulation: " It is hereby stipulated by and between the attorneys for the respective parties that a jury be and the same is hereby waived upon the trial of the above-entitled actions, and that the issues may be tried by the Court, and a verdict directed by the Court and judgment directed to be entered by the Court, with the same force and effect as though the issues had been submitted to a jury, and that the decision of the Court upon all the issues herein, both of law and of fact, shall be regarded with the same force and effect as the verdict of a jury."

It appears that the defendant is a corporation which assists Jewish people to become established as farmers in this country and to that end maintains a farm in the State of New Jersey for the purpose of giving instruction in farming and enabling applicants for assistance to discover whether they are suited to farm life. The nature of its activities will be discussed more in detail in that part of this opinion in which the question as to whether the defendant is a charitable corporation is considered.

The plaintiffs, having learned through advertisement of the existence and general nature of the defendant, entered into correspondence with the defendant which resulted in a call by them at the offices of the defendant in the city of New York. On arrival there they asked to see an official of the society and were directed to a Mr. Bluestein. The substance of the conversation which ensued between the plaintiffs and Bluestein is that they told the latter that they were interested in buying a farm; that they had about $500 which Bluestein told them was not enough, that they would need about $1,500 to which they replied that they might be able to raise additional money from Mr. Heinemann's brother. Bluestein then told them that the defendant had a farm in Jersey to which they could go and see whether they liked to live on a farm and then they could come back for further discussion. They asked him what it would cost to live on the farm and he told them that they would have to pay $5 for room and board. As it developed this meant $5 a week. He added, " you have to bring your laundry and blankets," and he gave them a list of things that they would need on the farm. They inquired when they should go to the farm and were told the following Thursday. They then informed him that it would not give them time to buy what they needed in New York to which he replied " It doesn't matter, you can go down and there is the station wagon on the farm, and you can

go with that to Bound Brook and by coming there you can get these things."

The plaintiffs accordingly proceeded to the farm arriving there on Thursday, March 6, 1941, where they were met by Edwin Tansky, the superintendent of the farm. The farm is about three miles distant from Bound Brook. On the morning of March 17, 1941, Tansky was intending to drive to the nearby town of New Brunswick in the station wagon belonging to the farm. There is some conflict in the evidence as to what took place between the plaintiff Grete Heinemann and Tansky but according to her evidence, which I accept, she had told him prior to that morning that she would have to buy some warm things for her work, that she was not familiar with the locality and did not know where to go and where to get them, and on the morning in question Tansky told her that he was going to New Brunswick and that she could do her shopping there; accordingly she got into the station wagon with Tansky and with a Mrs. Alexander who was the housekeeper of the farm. While on the way the accident happened under the following circumstances. Tansky was driving the car along the road at a speed of about forty-five to fifty miles per hour, the road was dry and it was a cold clear day. According to Tansky he was driving between twenty-five and thirty miles per hour and the wind made the car swerve so that it went toward the ditch and in attempting to prevent it from going into the ditch the car struck a telephone pole standing on the opposite side of the road, causing the injuries complained of. Tansky's testimony as to how the accident happened is rather vague but on his story the impact of the collision must have been severe, in fact he characterizes it as a severe crash. The roof of the car was torn off, the wooden body was wrecked and the glass in the part that struck the pole smashed. At no time prior to the collision did Tansky apply his brakes in an endeavor to check the progress of the car and his evidence does not account with any sufficiency for the car leaving the highway and crashing into the telephone pole except upon the theory that he failed to use proper care to maintain control. The injured plaintiff was in no position to do anything whatever to influence events and cannot be charged with contributory negligence. There is no question but what Tansky was in the employ of the defendant and that part of his duty was to operate the station wagon and that at the time of the accident he was acting in the course of his employment.

Under the facts as stated above, the plaintiffs are entitled to recover unless there be something in the circumstances which relieves the defendant from liability. The defendant claims

exemption from liability upon the following grounds: " 1. The law of New Jersey applies in determining the question of liability. 2. The injured plaintiff was a licensee and under the New Jersey law there is no liability to a licensee except in case of active wrongdoing. 3. The defendant is a charitable corporation and the plaintiffs beneficiaries of the charity. 4. Under the law of New Jersey a charitable corporation is not liable to its beneficiaries for damage occasioned by the torts of its servants."

The plaintiff maintains that: " 1. The defendant is not a charitable corporation. 2. The injured plaintiff was an invitee. 3. If the defendant be held to be a charitable corporation its liability to respond in damages for the torts of its servants is to be determined by the law of the state of its incorporation, to wit, the State of New York. 4. If the liability of the defendant is to be determined by the law of New Jersey, the law of New Jersey does not grant immunity to charitable corporations organized under the laws of a state which does not grant such immunity."

It is thus seen that there is a dispute between the parties as to whether the question of liability is to be governed by the law of the State of New Jersey or by that of the State of New York. It appears that the laws of the two States differ in two respects which are claimed to be pertinent to the situation here presented, these are, that by the law of New Jersey liability of the owner or operator of an automobile to a licensee riding therein is assimilated to the duty of the owner of property to a trespasser. (*Cowan* v. *Kaminow*, 128 N. J. L. 398; 26 A. [2d] 258.) While under the law of New York the duty to a licensee is substantially similar to the duty owned to an invitee in the situation here presented. (*Clark* v. *Traver*, 205 App. Div. 206; affd., 237 N. Y. 544.) Under the law of New Jersey a charitable corporation is in general not liable to beneficiaries of its charity for the torts of its servants (*Bianchi* v. *South Park Presbyterian Church*, 123 N. J. L. 325; 8 A. [2d] 567), while, under the circumstances of this case the law of New York grants no such immunity. (*Dillon* v. *Rockaway Beach Hospital*, 284 N. Y. 176.) If, however, it should be determined that the plaintiff was an invitee of the defendant at the time of the accident and if it should also be determined that by the law of New Jersey the immunity described above is not granted to corporations organized under the laws of a state which does not grant such immunity, it would then appear that the laws of the two States upon the questions here involved do not differ and it would be unnecessary to determine which law applies. Likewise, if it should be determined that the defendant is not a charitable corporation within the meaning of the New Jersey rule, the question

as to which law governs the matter of immunity of charitable corporations would not be involved.

It thus becomes appropriate to consider first whether Grete Heinemann at the time of the accident was a licensee or an invitee, and second, whether the defendant is a charitable corporation within the meaning of the New Jersey rule.

It appears that the plaintiffs at the time of their visit to the New York offices of the defendant were directed to Mr. Bluestein as the appropriate person with whom they should transact their business and it, therefore, appears that Bluestein told them in substance that they would be at liberty to travel in the defendant's station wagon from the farm for the purpose of purchasing necessary clothing and such was the purpose of the trip during which the accident occurred. This constitutes an invitation from Bluestein to the plaintiffs to ride in the station wagon for the purpose specified. Inasmuch as it does not directly appear that Bluestein was authorized to extend such invitation on behalf of the defendant, the defendant claims that no sufficient evidence of an invitation by the defendant has been introduced. With this position I cannot agree.

On calling at the office of the defendant and being directed to Bluestein as the proper person with whom to transact their business the plaintiffs were entitled to believe that Bluestein possessed the necessary authority and if, in fact, he had no such authority it was incumbent upon the defendant, which was in possession of all of the facts relating thereto, to show that Bluestein's authority did not extend to the making of the invitation in question. Defendant's legal expert testified that the question was one of fact for the jury as is shown by the following excerpt from his testimony.

By the Court: " Q. Now, Witness, we are about to close your examination. I am going to ask you one question. Watch it closely, then answer it. First assume all of the facts already assumed in all of the questions put to you by Mr. Ohlin and Mr. Rubenstein; then assume the additional fact that ten or eleven days before the accident, while in the office of the defendant in New York City, the vice-president handed to the plaintiffs a list of articles that they would require on the farm; that there was some talk about insufficient opportunity to get these articles in New York, and that then the vice-president who made the arrangements for the two plaintiffs to go to the farm, said this, or this in substance, ' There are stores near the farm, there is a station wagon at the farm, you purchase those articles after you get there; ' that on the day of the accident the plaintiff wife was in the station wagon for the purpose of going to the store and buying these articles

— now, after having assumed all of those facts, would that change your opinion as to the status of the plaintiff wife in the station wagon at the time of the accident, as to whether she was an invitee or a licensee? A. No question under those facts she was an invitee."

Redirect examination by Mr. Ohlin: " Q. Under those facts that the Court has put to you, what would be your status as being the recipient of the benefits of charity? A. The charitable organization, the defendant here sued, would not be responsible as a matter of law, because they are not liable for any negligent acts of their agents, servants, or employees, to any person receiving the benefits of that charitable organization. Q. And that is irrespective of whether she was a licensee or invitee? A. Irrespective of whether she was a licensee or invitee. It has no bearing. Q. The Court asked you to assume certain facts. Now, assuming that under the laws of New Jersey the person with whom the conversation in New York was had with reference to buying clothes in New Jersey, was a person who was described as being someone in the office, but without any proof as to who he was, what position he had, or what authority he had, would that change your opinion? A. The obligation is on the plaintiff to prove to the Court's satisfaction that she was in the automobile as an invitee, invited by someone authorized on behalf of the owner to so act. That is the plaintiff's obligation and burden in New Jersey. Q. Assuming the facts that I have just given you, that the person was simply described as a person in the office, and there is no testimony as to who he was or what his position was, would that change your opinion that you just gave to the Court? A. I think that would be a fair question for a jury to decide, whether or not under those circumstances he would be led to believe that that person had authority, and our court would so determine it to be a fact question."

So far, therefore, as the status of Mrs. Heinemann as an invitee is concerned and the legal consequences to be drawn therefrom, it is unnecessary to consider the conflict between the law of the State of New Jersey and that of the State of New York.

We shall next consider whether the defendant is a charitable corporation. The defendant's certificate of incorporation recites that the incorporators, " desiring to associate ourselves as a corporation for charitable, benevolent, scientific and educational purposes " incorporate for the following purposes.

" *First*: The particular objects for which the corporation is to be formed are: 1. The encouragement and direction of agriculture among Jews, residents of the United States, principally immigrants from Russia, Roumania and Galicia, the removal of such persons dwelling in the crowded sections of cities to agricultural and

industrial districts, and provision for their temporary support. 2. The grant of loans to mechanics, artisans and tradesmen, to enable them to secure larger earnings and accumulate savings for the acquisition of homes, in suburban, agricultural and industrial districts. 3. The removal of industries now pursued in tenements or shops, in crowded sections of cities, by aiding manufacturers and contractors to transfer their shops and business to agricultural and industrial districts where their employees may continue to labor and acquire individual homes. 4. The encouragement of co-operative creameries and factories and of storage houses for canning and preserving fruit and vegetables and making wine. 5. Co-operation with individuals, building associations, savings institutions and other corporations in carrying out the foregoing objects."

The purposes of the corporation are thus manifestly charitable in character, but the plaintiffs contend that the nature of its operations is such that is not conducting a charity and that if it is the plaintiffs were not the beneficiaries of any charitable purpose. The plaintiffs' claim is based principally upon the fact that the loans made by the defendant are, in general, secured by mortgages bearing six per cent interest, and that the real estate of the corporation in New Jersey has not been exempt from taxation to the extent that such exemption is given charitable corporations organized under New Jersey laws.

I do not regard either argument as at all conclusive in view of the testimony concerning the true purposes of the corporation which, so far as applicable to these plaintiffs, are to give instruction in farming to Jewish residents of the United States, including refugees from Europe, and to provide them with the means of becoming farmers, which is in itself a charitable purpose even if conducted without loss. The argument that the plaintiffs were not the beneficiaries of this charitable purpose is based upon the fact that they were required to pay five dollars weekly each for their board while at the defendant's New Jersey farm. It appears, however, that this charge was considerably below the actual cost of the service rendered and to the extent of the excess cost the plaintiffs were, therefore, beneficiaries.

There remains the question as to whether the New Jersey law grants immunity to charitable corporations for the torts of their servants if the law of the state of incorporation does not grant such immunity. The court has had the benefit of very complete argument and research by counsel for both sides of this litigation and a very large number of authorities have been cited and the testimony of members of the New Jersey Bar, learned in the law, has been taken upon the present state of that law from which it

appears quite conclusively that the immunity referred to is granted by the law of New Jersey to charitable corporations organized under the laws of that State. It likewise appears that in Kansas and California the immunity was extended to foreign corporations (*Webb* v. *Vought*, 127 Kan. 799; 275 P. 170; *Young* v. *Boy Scouts of America*, 9 Cal. App. [2d] 760; 51 P. [2d] 191), but it seems that in the place of incorporation of the charitable organization in each of those cases similar immunity was granted at the time. (*Hogan* v. *Chicago Lying-In Hospital*, 335 Ill. 42; 166 N. E. 461; *Bodenheimer* v. *Confederate Memorial Assn.*, 68 F. [2d] 507.)

No other case passing upon the question of whether such immunity from liability will be accorded to a corporation of a state other than that in which the tort was committed has been brought to the attention of the court, nor has the court's own research discovered any such case. This leaves the question undetermined by authority and without persuasive decisions in analogous cases from other jurisdictions.

The sole decision which has been presented on behalf of the plaintiffs on this question is *Matter of Prime* (136 N. Y. 347), in which the New York Court of Appeals held that where an exemption was given by statute to charitable corporations from certain taxation, the exemption applied only to domestic and not to foreign corporations, the court saying: " We are of opinion that a statute of a state granting powers and privileges to corporations must, in the absence of plain indications to the contrary, be held to apply only to corporations created by the state and over which it has the power of visitation and control." This decision is, of course, not directly in point since it involves the application of a statute rather than of a rule of common law, but the stress upon the absence of the power of visitation and control is significant. Under the circumstances, it becomes necessary to determine the question upon principle alone. Inasmuch as the New Jersey rule respecting immunity extends only to cases where the tort was committed against beneficiaries of the charity, it would seem to follow that the basis of the immunity is the waiver theory, even though there are expressions in the New Jersey authorities indicating that the question is one of general public policy, since the public policy theory would not limit the immunity to cases where suit is brought on behalf of beneficiaries. The waiver theory in essence is that the plaintiff by accepting the benefits of the charity impliedly agrees not to deplete the funds of the charity by claims for damages for torts arising out of the charitable operations of which he is receiving a benefit. But in this case the relationship between the plaintiffs and the defendant arose out of a contract made in

New York, in which State no such waiver is implied. Furthermore, it appears that the defendant never obtained authority from the State of New Jersey to exercise its corporate franchise in that State and never became subject to the control and visitation to which New Jersey corporations are held by the laws of the State of New Jersey. Non-profit corporations organized under New Jersey law for charitable purposes are required to obtain the approval of the commissioner of institutions and agencies to the certificate of incorporation, but it does not appear that the defendant, not being incorporated under New Jersey law, is subject to that requirement. To grant to the defendant the immunity which the New Jersey law grants to New Jersey corporations of a similar character would be to confer upon the defendant a privilege in respect of its operations in New Jersey which it does not have in respect of its operations within the State of New York. It thus appears that upon principle the defendant should have no greater immunity under the law of the State of New Jersey than it has under the law of the State of New York, and I accordingly hold that the defendant is not immune from liability as a charitable corporation under the law of New Jersey.

As it appears, if this reasoning is correct, that there is no conflict between the law of New Jersey and the law of the State of New York in respect of the matters concerning which it is claimed that such a conflict exists, I find it unnecessary to determine whether liability in this case is to be determined by the law of the State of New Jersey or by the law of the State of New York since it follows that whichever law be applied there is liability to the plaintiffs on the part of the defendant. The defendant introduced in evidence the plaintiff's application for admission to the training farm. That application reads as follows: " Application for admission to Refugee Training Farm. Name: Grete Babetta Heinemann. Address: 28 East 4th Street, Dunkirk, N. Y. Age: 30. Married or single: Married. Country of birth: Germany. Last residence: London. Occupation: Housewife. How long in the United States? 3½ months. Have you first papers? Applied for. Have you had any farm experience? A little. What is your general health? Good. What capital can you invest in a farm? Husband has approximately $1,300. If admitted I promise to exercise care in the handling of all tools, machinery and live stock, and I agree not to hold the Jewish Agricultural Society responsible for any damage or injury that I may suffer in the ordinary conduct of the Refugee Training Farm."

The defendant argues that this shows that the parties intended there should be no liability on the part of the defendant and also

that the applications are valid and effective covenants not to sue. The answer to this is twofold. The application is not pleaded either as a release or as a special agreement not to sue and if it were it would be ineffective as such since the accident did not occur " in the ordinary conduct of the Refugee Training Farm," but under exceptional circumstances not constituting a part of the conduct of the farm at all.

The injured plaintiff suffered severe injuries. The medical testimony indicates an extensive scalp laceration with injury to the masseter muscle requiring several stitches; laceration of the lobe of the left ear; seven fractured ribs; a dislocation of the right shoulder; concussion of the brain and numerous contusions and abrasions.

She has suffered severe pain while under treatment and was in a hospital in New Jersey for a period of four weeks. The shoulder injury limited the use of the right arm and hand which condition continued to the time of trial. After leaving the hospital in New Jersey she was confined to her home in bed in Dunkirk until September, 1941, and has been unable to do housework. Her nervous system has been affected. She is still under medical care suffering from a brain injury and will continue to require medical attention for a considerable period in the future. The rib injuries have reduced her chest capacity and thus affected her breathing.

There are also indications in the medical testimony that the head injury has affected the pituitary gland. Prior to the accident her health was good and she was suffering from none of the maladies above described. Under all of the circumstances, I am of the opinion that an award of damages in the amount of $6,500 is proper.

The evidence shows that the husband has incurred expense for medical attendance and hospital bills in the amount of $691.75 which does not include the charges of Doctors Schley and Heinemann, and does not include probable future medical expenses. In addition, he has suffered the loss of the services of Mrs. Heinemann who is unable to work effectively either as housewife or as assistant with the farm work.

Having in view the probable future expense as well as that already incurred, an award to him of damages in the amount of $1,500 is proper. Therefore, under the stipulation, I direct a verdict in favor of the plaintiffs and against the defendant in each of the two cases for the sum of $6,500 in favor of Grete Heinemann, and $1,500 in favor of Herbert Heinemann.

Let judgment be entered accordingly in favor of the plaintiff Grete Heinemann and against the defendant, for the sum of $6,500 and costs, and in favor of the plaintiff Herbert Heinemann and against the defendant in the sum of $1,500 and costs.